**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  August 31 2016**

John P. Gustafson
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| In Re:                                    ) | Case No. 14-30027 |
| ) | |
| Charles K. Palmer and                     ) | Chapter 7 |
| Tina M. Palmer,                           ) | |
| ) | Adv. Pro. No. 14-3032 |
|        Debtors.        ) | |
| ) | Hon. John P. Gustafson |
| ) | |
| Joseph Abraham and                        ) | |
| Sue Abraham,                              ) | |
| ) | |
|        Plaintiffs,      ) | |
| ) | |
| v.                                        ) | |
| ) | |
| Charles K. Palmer,                        ) | |
| ) | |
|        Defendant.       ) | |

## <u>MEMORANDUM OF DECISION</u>

This adversary proceeding is before the court for decision after trial on Plaintiffs Joseph Abraham ("Mr. Abraham") and Sue Abraham ("Mrs. Abraham")'s (collectively, "Plaintiffs" or "the Abrahams") "Complaint to Determine Dischargeability of Debt, Liability and Damages." Defendant

Charles K. Palmer ("Defendant", "Debtor", or "Mr. Palmer"), along with his wife Tina M. Palmer ("Mrs. Palmer"), are the debtors in the underlying Chapter 7 case. [Case No. 14-30027, Doc. # 1]. In their Complaint, Plaintiffs assert that Defendant is liable for alleged defamatory statements made by the Defendant while answering questions at an Allen Township Zoning Board Public Hearing [Doc. # 1, Main Document] and that the debt is nondischargeable under 11 U.S.C. § 523(a)(6).

Count I of the Complaint claims defamation, Count II claims false light invasion of privacy, Count III claims intentional infliction of emotional distress, and Count IV is a request for attorney fees. [*Id.*].

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising under a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of a debt are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(F).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case.

Based upon that review, and for the reasons discussed below, the court finds that Defendant is entitled to damages on the Complaint, but the debt is dischargeable in the underlying Chapter 7 case, and not excepted from the debtors' discharge pursuant to 11 U.S.C. § 523(a)(6).

2

# FINDINGS OF FACT

The pertinent facts in this case stem from three events: 1) an incident outside of Defendant's neighbors' home; 2) an incident alongside Trowbridge Road, the road on which Plaintiffs and Defendant's reside; and 3) the statements made by the Defendant at the Zoning Board hearing.

In addition to the three pertinent events in this case, Plaintiffs and Defendant have a history of contentious dealings with each other. According to Sheriff Robert L. Bratton in a letter addressed to the Ottawa County Common Pleas Court on April 20, 2011, calls for service to the Ottawa County Sheriff's Office, made by each family regarding the other, "number well over 100". [Doc. # 19, p. 29]. The number of phone calls made to the Sheriff's Office was enough to make Sheriff Bratton question whether an "abuse of law enforcement services" was occurring. [*Id.*].

**The Incident At The Neighbors' Home.**

Brittany Teet, Defendant's neighbor, lived in a house across the street from the Defendant. At the trial, she testified that she was friends with Defendant and his family, during the three years that she lived in the house on Trowbridge Road. When questioned by Defendant's attorney, her testimony recounted an incident that occurred on March 17, 2010. Because she worked second shift at the time, she did not get off work until "around 10 p.m.", and her husband and children were asleep when she arrived home.

After entering her home, Ms. Teet "started hearing yelling" and testified that what sounded like rocks were hitting her bedroom window. When she opened her bedroom window and looked out, she stated that she could see Plaintiff Joseph Abraham yelling "I know it was you" and hitting her mailbox. When questioned about how she could have identified Mr. Abraham that night, she replied that she heard his voice, saw his face, and recognized his familiar "walk".

3

After claiming to have witnessed Mr. Abraham walk back to his driveway down Trowbridge Road, Ms. Teet called Cody Palmer, Defendant's son. Ms. Teet believed that Cody Palmer might have had some knowledge as to why Mr. Abraham had walked down to her property. Cody was not at home with his parents, but he told Ms. Teet that he would tell his father, Defendant in this adversary case, what had occurred. When she called the police, Ms. Teet was informed that Mr. Abraham had already called the police. Ms. Teet made a police report. Cody Palmer called his father, and Defendant went to Ms. Teet's home, where she told Defendant what had occurred.

Mr. Abraham denied that any of the events Ms. Teet described as happening on the night of March 17, 2010 occurred: the small rocks thrown at the window, attempting to open the Teets' front door, striking the mailbox, and yelling profanities.

**The Incident Alongside Trowbridge Road.**

On July 13, 2010, there was an incident alongside Trowbridge Road. At the trial, it became evident that Plaintiffs and Defendant (together with their respective witnesses) each had their own version of what transpired on that evening.

According to Mrs. Abraham's testimony, the incident occurred around 9 p.m. It was still light out on a summer evening, and Mrs. Abraham and her daughter were sitting out on their front porch. Mrs. Abraham stated that Mr. Abraham was arriving home in his van, and he turned his van out into the road at an angle that would allow him to back into his driveway. According to Mrs. Abraham, Mr. Abraham "pretty much always backed in" to the driveway.

As Mr. Abraham was backing in, Mrs. Abraham heard what she thought was a motorcycle approaching. In reality, it was a dirt bike driven by Collin Palmer, Defendant's youngest son. She stated that Mr. Abraham's van had stopped backing in and was an estimated two feet out into the

4

road when the dirt bike passed by. Mrs. Abraham believed that her husband's van never moved during the time that Collin Palmer drove by. "[Collin Palmer] never stopped, never decreased in speed, never went off the road."

According to Mrs. Abraham, "seconds" after the dirt bike passed the Abraham residence, Collin's mother drove past the house. Mr. Abraham's van still had not moved and was jutting approximately two feet out into the road. Mrs. Palmer drove around Mr. Abraham's van and continued on down Trowbridge Road towards her house. Mrs. Abraham recounted that Mrs. Palmer "never stopped", and that "about a minute later" a white truck driven by Joshua Brier passed.

Amber Abraham, Plaintiffs' daughter, was with her mother on their front porch on the evening of July 13, 2010. She testified that her father approached the driveway and made a curve with the front of his vehicle out into the road, in an attempt to back in. In addition to Mrs. Abraham's testimony, Amber Abraham also said that her father always backed into their driveway. As her father's van was "sticking about a quarter onto the road," Collin Palmer drove by on the dirt bike and never stopped. When Mrs. Palmer drove by, Amber testified that she "honked a lot" and kept driving, and that Mrs. Palmer's green van continued to honk its horn until Mrs. Palmer turned into her driveway down the road.

Amber Abraham reiterated her mother's testimony regarding her father's van, when she testified that her father's van did not move as Collin Palmer, Mrs. Palmer, and Josh Brier drove past on Trowbridge Rd. After Amber's father backed into the driveway, she and her parents talked about the incident before the police came to their house. In her official statement given to the Ottawa County Sheriff's Office, Amber stated that all three vehicles (driven by Collin Palmer, Mrs. Palmer, and Josh Brier) turned into the Palmer's driveway just down Trowbridge Rd. [Pl. Ex. 25].

5

Mr. Abraham stated that he noticed a dirt bike approaching as he had turned to the left into the street at a forty-five degree angle in preparation of backing into his driveway. He testified that the dirt bike was in the middle of the road. As he was still at a "strange angle", Mr. Abraham testified that he pulled out a little further onto the road and stopped. While stopped, Collin Palmer passed by on his dirt bike, and Mrs. Palmer began honking from her van, which Mr. Abraham believed was still roughly fifty yards from his house. At the time, Mr. Abraham was unaware that it was Collin Palmer driving the dirt bike, but he stated that the dirt bike got so close to his vehicle that he thought the driver may have been drunk.

Collin Palmer was twelve when the incident occurred, and he had owned the dirt bike for roughly three years at the time of the incident. He testified that on July 13, 2010, he was returning home from a friend's house who lived nearby. His mother, Mrs. Palmer, was following him home from his friend's house in her vehicle. In her handwritten statement to police regarding the July 13, 2010 incident, she wrote that she had traveled to the nearby friend's residence to let Collin know that dinner was ready. [Pl. Exs. 18, 19].

As Collin was traveling on Trowbridge Road towards his home, his route took him past Plaintiffs' residence. As he was approaching Plaintiffs' residence, Collin stated that he was driving the dirt bike on the left berm of the road, on the opposite side of the road from the Plaintiffs' driveway. Collin observed that Mr. Abraham's vehicle was pulled into the driveway with the front of the vehicle aiming towards his house, and the rear of the vehicle facing the road. Collin stated that he "was sure" that he made eye contact with Mr. Abraham, and that Mr. Abraham backed the vehicle out into the road, forcing Collin to steer the dirt bike down into the ditch.[1] Collin had "no

---

[1]/At a civil restraining order hearing, held on January 24, 2011, Collin Palmer also testified that Mr. Abraham had pulled forward into his driveway, as opposed to backing in.

6

doubt" that Mr. Abraham pulled in forward and then backed his vehicle out towards Collin.

Collin testified that after getting the dirt bike out of the ditch, Collin drove the bike the rest of the way home. Shortly after pulling into his driveway, his mother pulled in behind him. Mrs. Palmer and Collin discussed what had just occurred, and they later described the incident to Defendant, although Collin could not recall who informed Defendant of the incident first, whether it was him or his mother.

At a court hearing held in 2011, related to state court litigation between the parties, Collin testified in a manner that made it seem as if Mr. Abraham pulled his vehicle out in a forward direction, which would corroborate Plaintiffs' testimony. However, on the date of the trial at hand and on the date of incident, Collin's testimony and written statement to the police was that Mr. Abraham backed his vehicle out toward Collin, forcing him into the ditch. [Pl. Ex. 20].

As Mrs. Palmer was suffering from a debilitating illness during the dates of the trial and was unable to testify, the parties stipulated to using portions of Mrs. Palmer's testimony given at a November 16, 2010 civil protection order hearing[2] [Doc. # 61] and a November 1, 2012 deposition [Doc. # 62] as a substitute for her appearing and testifying in open court. Additionally, the court can look to Mrs. Palmer's two-page handwritten statement regarding the incident on Trowbridge Road, which was produced for the police. [Pl. Ex. 18].

In her two-page statement, Mrs. Palmer wrote that she saw Mr. Abraham "pull into his driveway and as my son passed on the opposite side of [Mr. Abraham's] driveway [he] started to pull out and was heading right for my son on his dirt bike." [*Id.*]. She witnessed Collin "head into

---

[2]/ The civil protection order hearing took place in the Ottawa County Court of Common Pleas, in a case captioned "Brittany D. Teet vs. Joseph A. Abraham (Case No. 10CV581H) AND Tina M. Palmer vs. Joseph A. Abrahams [*sic*] (Case No. 10CV582H)".

the ditch", and then Mr. Abraham pulled into his driveway. As Mrs. Palmer was following Collin from a distance, she had not yet passed Plaintiffs' driveway. As she approached the driveway, "[Mr. Abraham] pulled back out on to the road and stopped [her] from passing. [She] laid on [her] horn and he did not move until a truck pulled up behind [her]." [*Id.*].

In her testimony at the civil protection order hearing, Mrs. Palmer specifically testified she witnessed Mr. Abraham "pulling in" to his driveway. [Doc. # 61, p. 17, l. 14]. "His front end of his car was toward his driveway. His back end of his car was toward the ditch so it was across the road." [*Id.*, p. 18, l. 7-9]. He then backed out at an angle, forcing Collin Palmer down into the ditch. At some point, Mr Abraham had pulled back into his driveway, because Mrs. Palmer stated that as she drove down Trowbridge Road towards her home and her son, "[Mr. Abraham] literally backed out and stop[ped] me from going down the road." At that point, Mrs. Palmer began "beeping and ... beeping" her horn at Mr. Abraham, who moved his vehicle back into his driveway when Joshua Brier's truck pulled up behind Mrs. Palmer. [*Id.*, p. 17, l. 17-25; p. 18, l. 1-2].

In her deposition testimony, Mrs. Palmer clarified that Mr. Abraham was in a white van during the Trowbridge Road incident, and she was in her van, which was either green or gray. She was unable to remember the exact color, as around the time of the incident, her family had a van of each color. [Doc. # 62, p. 26, l. 11-16]. She also clarified that her son was already on his way home from his friend's house, where she had gone to get him. After she told Collin Palmer that "it was time for dinner", she turned around on the road, "kind of like did a U-turn", and headed in the same direction as her son, back towards their home. [*Id.*, p. 28, l. 1-15].

At the deposition, Mrs. Palmer stated that Mr. Abraham was "backing out" of his driveway. After her son was forced into the ditch, and Mrs. Palmer approached Mr. Abraham's vehicle, Mr.

Abraham was "just backing out." [*Id.*, p. 30, l. 15-21]. She later stated that after she honked her horn at Mr. Abraham, and Joshua Brier pulled up behind her, Mr. Abraham "pulled into his driveway." [*Id.*, p. 35, l. 8-11].

Joshua Brier was driving the truck that pulled up behind Mrs. Palmer on Trowbridge Road. He testified that he heard car horns beeping as he pulled up, and that Mr. Abraham was backing his vehicle out into the road, as opposed to pulling forward out into the road. It was Mr. Brier's recollection that the rear of Mr. Abraham's vehicle was out in the middle of the road.

In his statement given to the police, which he filled out in Defendant's driveway roughly an hour or so after the incident, Mr. Brier wrote that Mr. Abraham had "stopped in the middle of the road and wouldn't let [Mrs. Palmer] drive down the road." [Pl. Ex. 22]. He wrote that Mr. Abraham had "backed out onto [the] road" [*Id.*], and he testified at the trial that there was "[n]o question in [his] mind that [Mr. Abraham's] vehicle was reversing out of the drive."

It is important to note that Defendant-Debtor did not witness any of the events that took place on Trowbridge Road on July 13, 2010. Charles Palmer testified that he had been in the hospital for a few days prior to the incident. Defendant was laying down when Mrs. Palmer and Collin returned home after the incident. When he got up from where he was laying and entered the room where Mrs. Palmer and Collin were talking, "Collin was telling [his mother] what happened."

Defendant testified that he never heard Mrs. Palmer call the police regarding the incident, as that had occurred before she entered their home. Defendant recalled hearing from both Mrs. Palmer and Collin what happened. Hearing the story told from Collin's perspective, Defendant could tell that "it scared him." Defendant also talked to Joshua Brier. Defendant stated that Joshua Brier's recollection "confirmed what [Mrs. Palmer] and Collin had said", regarding Mr. Abraham

backing his vehicle up into the road.

**The Statements Made By Defendant At The Zoning Board Hearing.**

In July 2010, Defendant was an auto mechanic by trade, and he was seeking approval from the Township Zoning Board to perform mechanical work for customers in a barn located on his property. [Doc. # 19, p. 6]. The Allen Township Zoning Board Public Hearing was held on July 20, 2010, seven days after the incident on Trowbridge Road. [Joint Ex. 1]. Plaintiffs were in attendance at the hearing, as they wanted to object to Defendant's request. According to the hearing sign-in sheet, fifteen other people attended the zoning board hearing, in addition to Plaintiffs, Defendant, and Defendant's wife. [Pl. Ex. 2].

After being sworn in, Defendant answered questions asked by the five-member Board of Zoning Appeals. [Joint Ex. 1, p. 3, l. 17-22]. Many of the questions asked sought answers as to how Defendant would operate his business. For example, the Board wanted to know how Defendant would store and dispose engine fluids, the size of the barn in which the repairs would take place, and the hours of operation of the proposed business. [*Id.,* p. 6-9].

After Defendant completed answering the Board's questions, ten of the people in attendance spoke to the Board in favor of Defendant being granted the zoning board approval. Additionally, a couple unable to attend the hearing wrote a letter in support of Defendant. [*Id.*, p. 23-36]. Mrs. Abraham then spoke to the Zoning Board, after handing the five-member Board some pictures of Defendant's property. She, and her husband, were the only people in attendance against Defendant being granted approval. A member of the Board asked her when the pictures were taken. She replied, "[w]ithin the last month. The bright light is the, I guess, protection that he has and it's shining right into our bedroom windows..." [*Id.*, p. 38, l. 22-24; p. 39, l. 1].

10

The bright light was coming from a security light mounted in Defendant's back yard. Mrs. Abraham later stated that the bright light was "not really a huge issue to us." [*Id.*, p. 43, l. 18-19]. She pointed out that in one of the pictures, a scorched area appeared around a window of Defendant's home. A member of the Board stated that the Board would have to ask Defendant about that, and they then asked that Defendant "come back up so we can ask him questions . . ." [*Id.,* p. 47, l. 1-12].

When Defendant returned to answer questions, he addressed several of the issues that were brought up by Mrs. Abraham. Defendant explained that an issue with a wood pellet stove had caused the black soot around the window. [*Id.,* p. 53, l. 9-21]. When asked how long the security light had been up, Defendant answered as follows, which is taken directly from the Zoning Board Hearing transcript:

Mr. Baker: Okay. How long has that been up?

Charles Palmer: That has been up since a week ago Tuesday - - or actually a week ago Wednesday, I'm sorry, Wednesday. And the reason for that, we've had multiple issues with the Abrahams and they physically tried to run my son and my wife over, and we have charges filed against them.

* * * * * *

Mr. Baker: Excuse me, excuse me.

Charles Palmer: You had asked me why it was there, that's why it was there, it was for our protection because we didn't know what he was going to do next. He assaulted our neighbors, has made threats at us. So the actual sheriff was the one who said, you know, you need to have some sort of security here, I was, like, well, I've got a big light, I'll put it up. And I called and made sure it was okay with the county before I did that.

[Joint Ex. 1, p. 56, l. 2-24; p. 57, l. 1].

At the trial, Defendant acknowledged that Mrs. Abraham did not try to run over his wife or

11

his son. Defendant testified that when he used the pronoun "they" in the sentence, "they physically tried to run my son . . ." at the Zoning Board hearing, it was a "slip of the tongue," as he "obviously didn't mean that they both were driving." Defendant also testified to his belief that what had happened to his wife and son on Trowbridge Road constituted an assault against them by Mr. Abraham.

When asked whether charges were ever filed against Mr. Abraham as a result of the Trowbridge Road incident, Defendant said that he found out seven days after the Zoning Board hearing that charges were not filed. However, he testified that when Defendant and his wife spoke to a police officer on July 13, 2010, the officer stated that "charges would be pressed by Monday." In the official narrative report, filled out by an officer of the Ottawa County Sheriff's Department, the officer wrote that he "advised Mrs. Palmer that [he] would do a report and forward it to the Prosecutors [sic] Office for review." [Pl. Ex. 17].

As a result of the incident on Trowbridge Road and the statements made by the Defendant at the Board hearing, Plaintiffs filed a complaint in the Ottawa County Court of Common Pleas.[3] Defendant and his wife filed a Chapter 7 bankruptcy petition in this court the day before the trial in the Ottawa County Court of Common Pleas was scheduled to begin. [Doc. # 1]. Plaintiffs timely filed their Adversary Complaint.

Defendant's statements at the Board hearing, specifically: "we've had multiple issues with the Abrahams and they physically tried to run my son and my wife over, and we have charges filed against them," and "[h]e assaulted our neighbors", made while in the presence of approximately

---

[3]/ *Abraham v. Palmer*, Case No. 11CV392. The complaint claims Defendant intentionally defamed the Plaintiffs willfully and with malice, for saying false information that placed the Plaintiffs in a false light and placed their interests in jeopardy, and for intentional infliction of emotional distress. [Doc. # 1].

12

fifteen to twenty people, is the alleged willful and malicious act that underpins Plaintiffs' lawsuit.

It is the Plaintiffs' contention that Defendant made the allegedly defamatory statements at the Zoning Board Hearing in order to get the Zoning Board to approve his request, as Plaintiffs were the only party opposing his request, and that Defendant's statements resulted in serious injury to the Plaintiffs.

## LAW AND ANALYSIS

### I.    11 U.S.C. § 523(a)(6)

Plaintiffs seek a determination that Defendant owes them a debt in connection with the allegedly defamatory statements he made, and that the debt is nondischargeable under 11 U.S.C.§ 523(a)(6).  A creditor must prove exceptions to dischargeability for individual debts under § 523(a), including the exception for fraud, by a preponderance of the evidence.  *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable.  11 U.S.C. § 523(a)(6).  The term "entity" includes a person.  11 U.S.C. § 101(15).

Plaintiffs have the burden to prove, again by a preponderance of the evidence, that the injury from which the debt arises was both willful and malicious.  *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001).  The cause of action arising from the injury must also be one that is not subject to a valid defense.  *See*, *Niedert v. Rieger*, 200 F.3d 522 (7th Cir. 1999); *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 450–51(2007)("state law governs the substance of claims. . ."); *In re Underwood*, 2013 WL 4874341, 2013 Bankr. LEXIS

3789 (Bankr. N.D. Ala. Sept. 12, 2013).

"Willful" and "malicious" are separate elements of Section 523(a)(6), and they must each be proved. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999)(the absence of either element creates a dischargeable debt); *In re Berlin*, 513 B.R. 430 (Bankr. E.D.N.Y. 2014); *see also*, *In re Salem*, 290 B.R. 479, 485 (S.D.N.Y. 2003)(*citing, In re Krautheimer*, 241 B.R. 330, 340 (Bankr. S.D.N.Y. 1999)).

Addressing the "willful" requirement of § 523(a)(6), the Supreme Court agreed that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts" and held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

A willful injury thus occurs when "(i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004)(*citing Markowitz*, 190 F.3d at 464). Under §523(a)(6), "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Id.* (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)).

Maliciousness is met when a party demonstrates that (1) the defendant-debtor has committed a wrongful act, (2) the defendant-debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action. *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir. 1991); *see also, Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,

14

1209 (9th Cir. 2001).

The decision in *Wheeler v Laudani*, 783 F.2d 610 (6th Cir. 1986) is an important precedent

in this case because it involved the dischargeability of a state court judgment for libel. The *Wheeler*

case pre-dated the Supreme Court's holding in *Kawaauhau v. Geiger*, meaning it was decided under

the less stringent standard of the Sixth Circuit's *Perkins v. Scharffe* opinion. As the Sixth Circuit

has explained in *Steier v. Best (In re Best)*, 109 Fed.Appx. 1, 4, 2004 WL 1544066 at *3, 2004 U.S.

App. LEXIS 13773 at **8-9 (6th Cir. 2004):

> Prior to *Geiger*, we had held that the § 523(a)(6) exception covered debts arising out
> of acts that were done intentionally and caused injury, without regard to whether the
> debtor intended the resulting injury to the creditor. "[A] wrongful act, done
> intentionally, which necessarily produces harm and is without just cause or excuse.
> may constitute a willful and malicious injury." *Perkins v. Scharffe*, 817 F.2d 392, 394
> (6th Cir.) (citation omitted), *cert. denied*, 484 U.S. 853, 98 L. Ed. 2d 112, 108 S. Ct.
> 156 (1987). The Supreme Court unanimously rejected that construction on the basis
> of 523(a)(6)'s language, its interrelation with nearby provisions, and the policies of
> the Code as as whole. . . .

*See also*, *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464-465 (6th Cir.

1999)(expressly overruling *Perkins* based upon the holding in *Geiger*).

Even using the "broader" *Perkins* definition of "willful and malicious", the *Wheeler* court

reversed the bankruptcy court's determination that the judgment for libel was non-dischargeable.

Because the judgment was based on a "general" verdict, and there was an alternative theory of

liability based upon a reckless disregard of whether the statements were false (rather than actual

knowledge of falsity), the *Wheeler* court held that the bankruptcy court had erred in holding the debt

non-dischargeable on summary judgment. *See*, *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.

1986)("Mere reckless disregard for the truth or falsity of the statement, which can support a libel

verdict, is not a willful and malicious injury for purposes of § 523(a)(6).").

15

Thus, the question as to whether there is liability under state law, and whether the debt (if any) is non-dischargeable, are separate issues, requiring the application of separate legal standards.

## II.    Defamation, False Light Invasion of Privacy, and Intentional Infliction of Emotional Distress Claims

The matter at hand involves Ohio law regarding defamation, false light invasion of privacy, and the intentional infliction of emotional distress.

In Ohio, to establish a claim for defamation, including a claim for slander, a plaintiff must prove the following elements: (1) a false statement of fact, (2) about the plaintiff, (3) was published without privilege to a third party,[4] (4) with fault or at least negligence on the part of the defendant, and (5) the statement was either defamatory *per se* or caused a special harm to the plaintiff.  *Savoy v. Univ. of Akron*, 2014-Ohio-3043, ¶ 18*,* 15 N.E.3d 430, 435 (10th Dist.); *McPeek v. Leetonia Italian-Am. Club,* 174 Ohio App.3d 380, 2007-Ohio-7218, 882 N.E.2d 450, ¶ 8 (7th Dist.); *Rennick v. Provident Bank,* No. 1:06CV820, 2008 WL 696893, at *7, 2008 U.S. Dist. LEXIS 19111, at *19 (S.D. Ohio Mar. 12, 2008).

In 2007, the Supreme Court of Ohio recognized the tort of false-light invasion of privacy and adopted the Restatement of the Law 2d, Torts, Section 652E definition.  *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 473, 866 N.E.2d 1051, 1059 (2007).  The *Welling* Court explained the tort claim

---

[4]/ The statements made in this case were in a Zoning Board Hearing where the Defendant was sworn in prior to giving his testimony.  At the Summary Judgment phase of this action, there was no evidence relating to whether or not Defendant was sworn in, or was otherwise acting as a witness in a quasi-judicial proceeding.  [Doc. #21, p.3].  Under Ohio law, this may be sufficient to give rise to an privilege against a defamation action, as long as the defamatory statement is reasonably related to the proceeding in which it appears.  *See e.g.*, *Hecht v. Levin*, 66 Ohio St. 3d 458, 613 N.E.2d 585 (1993); *Surace v. Wuliger*, 25 Ohio St.3d 229, 495 N.E.2d 939 (1986), syllabus.  However, no affirmative defense was raised in the Answer, or at any time prior to the close of evidence.  While there is authority supporting a bankruptcy court raising this issue sua sponte, because of the important public policy considerations, that case was decided under Wisconsin law.  *See*, *Niedert v. Rieger*, 200 F.3d 522, 525-527 (7th Cir. 1999).  Moreover, the *Niedert* decision upheld the bankruptcy court's decision to dismiss the action *sua sponte*, it did not require courts to do so.

as involving

> one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Welling*, at 473. The *Welling* decision also recognized that "[t]he requirements imposed by the Restatement make a false-light claim difficult to prove." *Id.* at 471. It is required that the "publicized" statement be untrue and:

> it applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity.... The plaintiff's privacy is not invaded ... when the unimportant false statements are made, even when they are made deliberately. It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy.

*Welling,* at 472 (*quoting,* Restatement (Second) of Torts, § 652E, cmt. c).

A plaintiff does not need to be defamed in order to recover for a false light invasion of privacy. Rather, "[i]t is enough that [a plaintiff] is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Restatement (Second) of Torts, § 652E, cmt. B (1977). In a false light claim, the burden is on the plaintiff to prove by clear and convincing evidence that the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling*, at 472.

In Ohio, liability arising from the intentional infliction of emotional distress can only be found where conduct is so outrageous in character and to so extreme a degree, the conduct goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a

17

civilized community. *Burgess v. Fischer,* 735 F.3d 462 (6th Cir. 2013).

To establish a *prima facie* claim for the intentional infliction of emotion distress, "a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Phung v. Waste Mgmt., Ind.,* 71 Ohio St.3d 408, 644 N.E.2d 286, 289 (1994).

The standard under Ohio law for stating an intentional infliction of emotional distress claim "is exacting" and "[t]he 'outrageousness' element is a question of law for the Court to decide. . . ." *Cummings v. Greater Cleveland Reg'l Transit Authority*, 88 F.Supp. 3d 812, 821 (N.D. Ohio 2015). The emotional distress required for such a claim "may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks,* 6 Ohio St.3d 72, 78, 451 N.E.2d 759, 765 (1983). "A non-exhaustive litany of some examples of serious emotional distress . . . include traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.*

## III. Application of Ohio Law and 11 U.S.C. § 523(a)(6) to Plaintiffs' Claims

In this case, it is important to distinguish two things: 1) what Defendant believed to be true based upon what he had been told about the two incidents; and 2) the evidence regarding what actually happened in those two incidents. The former, Defendant's understanding of two incidents that he did not personally witness, is of primary importance in determining non-dischargeability under § 523(a)(6). It is also a factor in determining some state law issues. However, for purposes of Plaintiffs meeting their burden of establishing that the statements in issue were false,[5] and

---

[5]/ *Brown v. Lawson*, 169 Ohio App. 3d 430, 438, 2006-Ohio-5897,¶ 21, 863 N.E.2d 215, 221 (1st Dist.).

18

Defendant establishing "truth as a defense" under state law,[6] the evidence regarding what actually occurred is paramount.[7]

The court finds, based upon the evidence presented, that the statements made in response to the last question about the security light were responsive to the question Defendant was asked, were not pre-planned, and were not part of a scheme to gain zoning approval. On the other hand, Defendant had an opportunity to clarify his statements when he was challenged by the Abrahams, and he did not do so. [Jt. Ex. 1, pp. 55-58].

Applying the legal standards to the facts in the case, Plaintiffs have not provided sufficient proof that Defendant's conduct rose to the levels required to rule for the Plaintiffs in their false light invasion of privacy, and intentional infliction of emotional distress claims. The court does find that there is sufficient proof to support a finding of defamation. However, Plaintiffs have not met their burden of proof that Defendant's conduct was "willful and malicious," within the meaning of section 523(a)(6).

To determine if a statement is defamatory, the statement must first be a factual statement, and not an opinion. "This is a question of law and the court should apply a totality of the circumstances test, considering the specific language used, whether the statement was verifiable, the general context of the statement, and the broader context in which the statement appears." *Alahverdian v. Grebinski*, 2014 WL 2048190, at *5 (S.D. Ohio May 19, 2014)(*citing, Curry v. Village of Blanchester*, 2010-Ohio-3368, ¶ 47 (Ohio App. 12th Dist. 2010)).

---

[6]/ O.R.C. § 2739.02 ("In an action for a libel or a slander, the defendant may allege and prove the truth of the matter charged as defamatory. Proof of the truth thereof shall be a complete defense. In all such actions any mitigating circumstances may be proved to reduce damages.")

[7]/ 35 O.Jur.3rd § 59 ("While the truth of the statement made by the defendant is a complete defense in an action for defamation, the mere belief of the defendant in the truth of a statement that is actually false is not a defense, even though the belief is based on probable cause.").

19

Plaintiffs allege that Defendant defamed them when he stated at the Zoning Board hearing in front of Plaintiffs and a number of other people that "[Plaintiffs] physically tried to run my son and wife over, and we have charges filed against them . . . He [Mr. Abraham] assaulted our neighbors, has made threats at us."

The first element of a defamation claim is that a false statement of fact needs to have been made. In applying the totality of the circumstances test to determine if Defendant's statement was factual, this court determines that it was a factual statement, and not just Defendant's opinion. Defendant made his statement based upon the factual statements his wife, son, and Joshua Brier had conveyed to him regarding the incident alongside the road, and the court concludes that Defendant was attempting to relay his understanding of those facts to the Zoning Board, in responding to their questions regarding the issues brought up by Mrs. Abraham.

Not all of the statements complained of have been shown to be sufficiently "false" to be actionable. The court finds that the testimony given by Collin Palmer, Joshua Brier, the testimony admitted from Mrs. Palmer's deposition, and the other documents that were introduced, taken together, provide a factual basis for description of the events that occurred on July 13, 2010, which Defendant then relayed, to the best of his knowledge at the time, to the Zoning Board.

A bankruptcy court is in the best position to assess the testimony and the credibility of the witnesses appearing before it, *Kaye v. Agripool, SRL (In re Murray, Inc.),* 392 B.R. 288, 297 (6th Cir. BAP 2008), and giving such a deference to a trial court is necessary, "because the trial judge is in the best position to determine the credibility of witnesses." *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1166 (6th Cir. 1996). *See also, In re Phillips,* 434 B.R. 475, 484 (B.A.P. 6th Cir. 2010).

20

Over the course of six years, neither Joshua Brier, Collin Palmer, nor Mrs. Palmer's recollections regarding the July 13, 2010 incident changed in such a manner that could not be explained by the age of the youngest witness and the fact that nearly six years had passed from the date of the incident to the time they testified in various hearings and depositions related to the state court proceedings, and to the time Joshua Brier, Collin Palmer, and Defendant testified in the trial before this court.

The significant details, as the court construes them as having happened on July 13, 2010, are as follows: Collin Palmer was on his way home from his friend's house, with Mrs. Palmer following him. As Collin Palmer traveled down Trowbridge Road, Mr. Abraham was in his vehicle at the end of the driveway. Mr. Abraham stopped as he was pulling into his driveway, and for whatever reason, moved back out into the road as Collin Palmer went by, which caused Collin Palmer to drive his dirt bike down into the ditch. The evidence related to whether Mr. Abraham was attempting to run Collin Palmer off the road is conflicting, and neither party carried its burden - Plaintiffs did not prove that the statement that Mr. Abraham tried to run Collin off the road was false (a necessary element for his defamation claim), nor did Defendant provide sufficient proof to demonstrate "truth as a defense".

As Mr. Abraham's vehicle was still out in the road, Mrs. Palmer approached, stopped and waited, as it seemed that Mr. Abraham was adjusting his vehicle in the driveway. It was also at this point in time when Joshua Brier came up to the scene of the incident, and he testified as to what he observed. This series of events was corroborated by testimony and by evidence introduced at trial, and Mr. Brier, Mrs. Palmer, and Collin Palmer's statements made to the police that same day do not contradict their testimony many years later.

21

It is clear that this information was later given to Defendant through the conversations he had with his wife, his son, and with Joshua Brier. However, Defendant had no reason to believe that Mrs. Abraham had ever "physically tried to run my son and wife over". Further, there does not appear to be a basis for asserting that Mr. Abraham tried to "run over" Defendant's wife. She stopped her car, but there was no evidence that Mr. Abraham tried to "run her over".

Nor did the evidence reflect any basis for Mrs. Abraham having charges filed against her. Defendant knew these facts, and yet used "they" and "them" - encompassing both Mr. and Mrs. Abraham - in his testimony. The statement that "they" tried to run over his son is factually incorrect. While it would be absurd to think of two people driving one vehicle, it is not absurd to think that there could have been more than one incident involving different drivers.

On the other hand, the court recognizes that there is a strong element of inadvertence in the use of "they" and "them", coming in part from the stress of the circumstances leading up to the Zoning Board Hearing, the Hearing itself, and the fact that both Mr. and Mrs. Abraham were present.

The Complaint captions Count I as "Willful Defamation", asserting that the statements of Defendant were "willful defamation". [Doc. #1, p. 3]. There is no such action under Ohio law. Instead, ordinary negligence is sufficient to state a claim for defamation against a private person (or "private-figure") plaintiff under state law. *See*, *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987).

The court found Ms. Teet's testimony to be credible enough to rebut Mr. Abraham's contention, by a preponderance of the evidence, that nothing untoward happened on the evening of March 17, 2010. While some of the testimony involved interpretations of Ms. Teet's perceptions,

22

the evidence presented supports her contention that an incident did take place wherein Mr. Palmer came to her house in an agitated state and made a disturbance.

Defendant is neither an attorney nor a legal expert who would be aware of the legal definitions regarding assault and/or battery. Most of those in attendance at the Zoning Board meeting, supporting his application, would be aware that he was not an attorney, and his testimony that he was doing auto repair work would inform anyone who was not already aware of that fact.

It was evident to the court during the trial that Defendant's statement regarding Mr. Abraham having assaulted his neighbors was in reference to the evening that Mr. Abraham was on Mrs. Teet's property causing a disturbance. Defendant mistakenly believed that to be an "assault" of his neighbors, but it does not change the fact that his statement on that matter at the Zoning Board Hearing is within the parameters established by Ohio defamation law regarding "substantially true".

The "truth" will protect a defendant from liability even when the literal truth of a defamatory statement is not established. Courts have ruled that slight inaccuracies are tolerated, and that the test in such an instance is whether a defendant's statement is "substantially true." *See, Roe ex rel. Roe v. Heap*, 2004-Ohio-2504, ¶ 22 (10th Dist.); *Murray v. Knight-Ridder, Inc.,* 2004-Ohio-821, ¶ 46 (7th Dist.); *Natl. Medic. Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App.3d 752, 755, 573 N.E.2d 1148, 1150 (1st Dist. 1989)("It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation."); *Quinn v. Ocwen Federal Bank FSB*, 470 F.3d 1240, 1246 (8th Cir. 2006)("Further, 'the exact truth is not required. It is now generally agreed that it is not necessary to prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is substantially true . . . .'")(citation omitted); *Stilts v. Globe Int'l, Inc.*, 91 F.3d

23

144 (6th Cir. 1996).

The statement that "we have charges filed against them" would also appear to be within the scope of "substantial truth" for Mr. Abraham (although not Mrs. Abraham) based upon the fact that the Defendant's statement references "we" filed charges against them, not that some third party, like a prosecutor had "filed charges". Factual allegations had been made to the police regarding Mr. Abraham and the Trowbridge Road incident and, unbeknownst to Defendant, the prosecutor had elected not to pursue an action against Mr. Abraham. It is a close issue, but the court finds for Defendant on this sub-issue.

Plaintiffs did not meet their burden of proof regarding the falsity of the statement regarding threats being made by Mr. Abraham. Further, because the evidence regarding what happened on Trowbridge Road was so unclear, the court cannot find that Mr. Abraham has met his burden of proof showing the falsity of the statement that he "tried to run over" Collin Palmer by a preponderance of the evidence.

Because Defendant's statements to the Zoning Board were, in part, defamatory, Defendant is liable for damages to Plaintiffs under Count I of the Complaint.

Plaintiffs' Count II brings a false light invasion of privacy claim. Defamation is not necessary for Plaintiffs to succeed on their false light theory. Instead, "[i]t is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Restatement (Second) of Torts, § 152E cmt. b.

Similar to a defamation claim, truth is a defense to an action alleging false light invasion of privacy. *See, Alahverdian v. Grebinski*, 2014 WL 2048190 at *14, 2014 U.S. Dist. LEXIS 125190

24

at *40 (S.D. Ohio May 19, 2014)("The truth of a statement serves as a defense against claims of false light. As set forth by Ohio law, in order to make a showing of false light, first, the statement made must be untrue." (internal quotation marks and citation omitted)). In the Plaintiffs' view, the statements made by Defendant at the Zoning Board hearing contained false information that placed them in a false light before the public who were in attendance at the hearing. [Doc. # 1, ¶ 21].

For essentially the same reasons that the court found for Plaintiffs on the defamation claim, the court finds for the Plaintiff on Count II, the "false light" claim.

Count III of Plaintiffs' Complaint brings a cause of action for intentional infliction of emotional distress. The Ohio Supreme Court set forth the elements of an IIED claim as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.,* 453 N.E.2d 666, 671 (Ohio 1983)(citations omitted), *abrogated* on other grounds by *Welling,* 866 N.E.2d at 1054-59.

"[E]xtreme and outrageous conduct" gives rise to liability when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (*quoting,* Restatement (Second) of Torts § 46 cmt. d.). "Whether conduct is 'extreme and outrageous' is initially a question of law for the court." *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 714 (Ohio Ct. App. 2009)(citation omitted).

Based upon the testimony and exhibits presented at trial, this court does not find that the comments made by Defendant at the Zoning Board hearing to have been extreme and outrageous, nor can the court find said statements to have gone beyond all possible bounds of decency, that they

25

were atrocious and intolerable in a civilized society. When Defendant made his comments, he was addressing questions from the Zoning Board , that the Board was asking as a direct result of pictures they were given moments earlier by Mrs. Abraham. When asked, "[h]ow long has that [security light] been up?" by a member of the Zoning Board, it was neither outrageous nor extreme that Defendant went into some detail as to why he put the security light up. [Joint Ex. 1, p. 56, ll. 2-9].

Because Defendant's statements were neither extreme nor outrageous, nor can they be regarded as atrocious or intolerable in a civilized community, Plaintiffs have failed to prove intentional infliction of emotional distress. Thus, the court finds for Defendant on Count III of Plaintiffs' Complaint.

However, as previously stated, the record before the court and the testimony given at trial simply do not support a finding of willful and malicious injury to Plaintiffs, as there was no showing that Defendant had an intent to harm Plaintiffs through his statements, nor was there a sufficient showing that Defendant believed an injury was substantially certain to result.

In interpreting the exceptions to discharge under § 523(a), the Sixth Circuit has held that there is a "general rule that exceptions to discharge in § 523(a) must be narrowly construed." *Bd. of Trustees v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007); *Meyers v. IRS (In re Meyers)*, 196 F.3d 622, 624 (6th Cir. 1999). As previously discussed, recklessness is not sufficient to support a finding of nondischargeability under § 523(a)(6), even before the Supreme Court's decision in *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). *See, Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir. 1986).

The *Geiger* decision added the requirement that the actor intend the consequences of the act, not just the act itself. Under this additional stringent standard, the claims for defamation and false

26

light are not nondischargeable.  *See also*, *Qui v. Zhou (In re Zhou)*, 331 B.R. 274, 277 (Bankr. E.D. Mich. 2005);  *In re Faller*, 547 B.R. 766, 771-772 (Bankr. W.D. Ky. 2016); *In re Gorchev*, 275 B.R. 154, 170 (Bankr. D. Mass. 2002); *Langan v. Evers (In re Evers)*, 212 B.R. 945, 949 (Bankr. E.D. Wis. 1997).

Plaintiffs have not met the difficult post-*Geiger* burden of showing conduct going beyond recklessness, and showing an intent to cause injury.  The evidence before the court indicated that Defendant either believed his statements to be true when they was made to the Zoning Board, or in overstating the events he described, he was negligent, or at most reckless.  Thus, based upon Supreme Court and Sixth Circuit precedent, the court finds that Defendant did not act with the required mental state, which requires something greater than negligence or recklessness, to satisfy the requirements of a Section 523(a)(6) nondischargeability ruling.

## IV.    Damages.

Based upon the holding that the debt in issue is dischargeable, the damages in issue will be paid, if there are funds available, from the bankruptcy estate.

The Plaintiffs have filed a timely proof of claim for $25,000. [Claim # 21-1].  The evidence presented at trial did not support damages in excess of $25,000.

Under Federal Rule of Bankruptcy Procedure 3001(f), the Abrahams' timely filed proof of claim constitutes "prima facie evidence of the validity and amount of the claim."  The Defendant has not met its burden of overcoming the presumption, by showing that the claim should not be allowed as filed.

Accordingly, the court finds the damages in this case to be the amount set forth in Plaintiffs' proof of claim.

27

## **CONCLUSION**

Plaintiffs' claims for defamation and false light invasion of privacy, Counts I and II of their Complaint, are granted.  The claim for intentional infliction of emotional distress, Count III of the Complaint, is denied.  The claims that Counts I and II of Plaintiff's Complaint are nondischargeable under § 523(a)(6) is denied.  The court will enter a separate judgment in accordance with this Memorandum of Decision.

14-03032-jpg    Doc 78    FILED 08/31/16    ENTERED 08/31/16 16:49:49    Page 28 of 28